UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO: 24-12453 |
| VETERANS HOLDINGS, LLC, | § § § | CHAPTER 11 |
| DEBTOR. | § § § | SECTION A |

<u>REASONS SUPPORTING ORDER OF JUNE 24, 2025 CONVERTING CASE TO ONE UNDER CHAPTER 7</u>

Before the Court is the *Motion: (I) To Convert Case to Chapter 7 and For Relief from the Automatic Stay, (2) Alternatively, For Relief from the Automatic Stay, or (3) Further in the Alternative to Dismiss Chapter 11 Case* (the "<u>Motion</u>"), [ECF Doc. 104], filed by Richards Clearview City Centers, LLC's ("<u>Richards</u>"), and the Objection to the Motion, [ECF Doc. 120], filed by Veterans Holdings, LLC (the "<u>Debtor</u>"), and the reply in support of the Motion, [ECF Doc. 136], filed by Richards.

The Court held an evidentiary hearing on the Motion on June 17, 2025, and, following the close of evidence, continued the hearing to June 24, 2025. On June 16, 2025, Richards and the Debtor filed a stipulation as to facts and the admission of certain exhibits. [ECF Doc. 146]. On June 24, 2025, the Court entered its Order granting the Motion, [ECF Doc. 157], for the following reasons and those stated on the record at the June 17, 2025, hearing.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Court may finally adjudicate the matters raised in the Motion pursuant to 28 U.S.C. § 157(b)(1), and the matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

# FINDINGS OF FACT[1]

### I. The Debtor is a Single Asset Real Estate Debtor.

The Debtor commenced this bankruptcy case on December 17, 2024, by the filing of its voluntary petition for relief under chapter 11 of title 11 of the United States Code. *See* [ECF Doc. 146, ¶ 17]; *see also* [ECF Doc. 1]. The Debtor identified itself as a "single asset real estate" debtor, as defined in 11 U.S.C. § 101(51B). *See* [ECF Doc. 146, ¶ 1]; *see also* [ECF Doc. 1, § 7].

The Debtor's real estate consists of non-residential real property situated at 4427-4445 Veterans Blvd. in Metairie, Louisiana (the "Property"). [ECF Doc. 146, ¶ 2]. The Debtor's only source of income is through lease of the Property. *See id.* ¶ 3. The Debtor has no employees. *See id.* ¶ 4.

### II. Richards Is the Debtor's Senior Secured Lender Holding a Prepetition Secured Claim in the Approximate Amount of $2,058,000 Which Amount is Secured by the Property and Its Rents.

Richards is the holder of two Promissory Notes made by the Debtor, to wit: (i) that certain promissory note dated September 7, 2012, in the original principal amount of $2,245,000.00 ("Note 1") and (ii) that certain promissory note dated June 7, 2013, in the original principal amount of $122,045.00 ("Note 2" and together, the "Notes"). *See id.* ¶ 7.

Richards is the holder of that certain Collateral Mortgage Note made by the Debtor dated September 7, 2012, and paraphed *Ne Varietur* for Identification with an Act of Collateral Mortgage passed before Ryan Scafidel, Notary Public in and for the State of Louisiana, Parish of Orleans,

---

[1] To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

2

bearing said Notary's signature and Seal dated September 7, 2012 (the "Collateral Mortgage Note"). *See id.* ¶ 8.

The indebtedness evidenced by the Notes and the Collateral Mortgage Note is secured, inter alia, by: (i) that certain Collateral Mortgage executed by the Debtor by authentic act on September 7, 2012, originally recorded in the Jefferson Parish Mortgage Records on September 10, 2012 at Instrument No. 11241703, and duly reinscribed (the "Mortgage"); (ii) that certain Pledge of Collateral Mortgage Note executed by the Debtor by authentic act on September 7, 2012; and (iii) that certain Assignment of Leases and Rents executed by the Debtor on September 7, 2012, originally recorded in the Jefferson Parish Conveyance Records on September 10, 2012 at Instrument No. 11241704, and duly reinscribed ("Assignment of Rents"). *See id.* ¶ 9.

The Mortgage and Assignment of Rents are valid, properly perfected, and first-priority encumbrances upon the collateral described therein. *See id.* ¶ 10. The Notes bear interest at a variable rate computed using the Gulf Coast Bank Prime Lending Rate as the index (the "Index"). The rate applicable to Note 1 is the Index minus 1.1%. *See* Richards Ex. 2. The rate applicable to Note 2 is the Index minus .838%. *See* Richards Ex. 3.

By letters dated November 14, 2023, Richards notified the Debtor that the variable interest rates applicable under the Notes were adjusted: (i) with respect to Note 1, to the rate of 10.15% effective December 7, 2023, and (ii) with respect to Note 2, to the rate of 10.412%, effective December 17, 2023. *See* [ECF Doc. 146, ¶ 11]; *see also* Richards Exs. 12 & 13. The parties stipulate for the purposes of the Motion and Objection that at the time of the notifications of the rate increase, the Index was 11.25%. *See* [ECF Doc. 146, ¶ 12]; *see also* Richards Ex. 22. Thus, under the terms of the Notes, the rates identified in the notifications of the rate adjustments were calculated correctly.

### III. The Debtor Defaulted on the Notes and Richards Instituted Foreclosure Proceedings; the Debtor Filed this Case on the Eve of the Scheduled Foreclosure Sale.

The Debtor defaulted on the Notes following the notices of rate increases. *See* Hr'g Rec'g 10:36–:54 (Jun. 17, 2025) (testimony of Kristina May). The Debtor's monetary and non-monetary defaults were set forth in a Notice of Default and Acceleration of Promissory Notes sent by Richards to the Debtor on or about March 13, 2024, which demanded repayment in full of the Notes. *See* [ECF Doc. 146, ¶ 14]; *see also* Richards Ex. 14.

The Debtor did not pay the Notes following demand, and Richards instituted foreclosure proceedings on June 28, 2024, in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, Case No. 855-682 (the "Foreclosure Action"). *See* [ECF Doc. 146, ¶ 15]; *see also* Richards Ex. 20. The Property was scheduled to be sold at auction in the Foreclosure Action on December 18, 2024, but the sale did not occur as a result of the Debtor's bankruptcy filing. *See* Hr'g Rec'g 10:36–:54.

After the Debtor filed for bankruptcy relief, Richards timely filed Proof of Claim No. 4 setting forth a balance due to Richards as of the Petition Date of $2,058,241.17 (the "Richards Claim"). Richards reserved the right to claim post-petition interest and attorneys' fees allowable under 11 U.S.C. § 506(b) as an oversecured creditor. Post-petition interest accrues on the Notes at a rate of eighteen percent (18%) per annum and a per diem rate of approximately $841/day when applied to the prepetition principal balance. *See id.* As of June 25, 2025, 190 days have elapsed from the Petition Date, resulting in post-petition interest in the amount of approximately $159,790.00. Richards has incurred approximately $173,000 in attorneys' fees since the Petition Date. *See id.* The Debtor has not made any payments to Richards during this case. *See id.*; *see*

4

*also* Hr'g Rec'g 10:54–11:21 (Jun. 17, 2025) (testimony of Cullan Maumus). Accordingly, as of June 25, 2025, Richards asserted a total claim against the Debtor for approximately $2,391,031.17.

**IV.  The Debtor's Prepetition Financial Struggles.**

No payments have been made to Richards in over a year. *See* Hr'g Rec'g 10:36–:54; Hr'g Rec'g 10:54–11:21. Further, the Debtor has not paid its junior secured creditor, Capital Advisors, in over a year; has not paid property taxes in several years; and has not made payments on its right-of-way lease with Jefferson Parish in several years. *See* Hr'g Rec'g 10:54–11:21. The Debtor spent more than $16,000 in tenant deposits prior to the Petition Date and filed its bankruptcy case with approximately $1,500 in its bank account. *See id.* During the same time that it was not paying creditors, the Debtor loaned related entities more than $95,000 and made loans or transfers to several other related entities or insiders. *See id.*

Between 2019 and 2023, the Debtor borrowed more than $2.4 million from Capital Advisors to cover its costs of operation. *See id.*

The Debtor has scheduled approximately $2 million in causes of action against former tenants for unpaid rent. *See* [ECF Doc. 22].

On the Petition Date, the Debtor had three tenants for the Property, which can accommodate up to twenty (20) tenants. *See* Debtor Ex. 10. Those tenants occupied 3,521 of the Property's 15,700 square feet of rentable area (approximately 22% of the rentable space). *See id.*

**V.  The Debtor's Post-Petition Performance.**

During the six (6) months since the Petition Date, the Debtor has procured three (3) new leases with two (2) new tenants. As a result of rent concessions granted to new tenants, not all tenants are currently paying the Debtor rent. *See* Hr'g Rec'g 10:54–11:21. Once these new tenants

begin paying rent, the Property will still stand at only forty-eight percent (48%) economic occupancy.

The Debtor is breaking even—but it is not paying adequate protection (much less servicing the debt) to senior or junior secured creditors, and it is not paying property taxes, right-of-way lease payments, or other operational expenses. *See id.* All amounts which the Debtor has paid post-petition, it has paid using Richards' cash collateral or through equity contributions.[2] The Debtor has not entered into any letters of intent with additional prospective tenants. *See id.* The Debtor has also terminated its broker, Latter & Blum, due to the Debtor's dissatisfaction with the pace of leasing and compensation arrangement and is currently searching for a replacement broker. *See id.*

The Debtor's monthly operating reports reflect total income from the Property of $4,815 in December 2024, [ECF Doc. 80]; $11,221 in January 2025, [ECF Doc. 81]; $7,128 in February 2025, [ECF Doc. 88]; $14,955 in March 2025, [ECF Doc. 109]; and $7,128 in April 2025, [ECF Doc. 131].[3] The Debtor has not filed its monthly operating report for the period ending May 30, 2025.

As of the date of its most recent monthly operating report, the Debtor had an ending cash balance of $49,937. But $46,656.10 of that sum represents tenant deposits. *See* Hr'g Rec'g 10:54–

---

[2] The Court has previously ruled that the Debtor may not use cash collateral to pay the monthly fee to its manager, MagNOLA, LLC, or certain payments to professionals. Accordingly, equity has funded certain of those expenses.

[3] Although the monthly operating report for the period ending April 30, 2025, reflects $39,734 in total receipts for the month, the report clarifies and Debtor's representative, Cullan Maumus, testified that: (i) $30,606 of this amount constituted tenant deposits and (ii) $2,000 of this amount was a member contribution to pay Maumus's monthly fee which the Court previously ruled the Debtor could not use cash collateral to pay.

6

11:21; *see also* [ECF Doc. 131] (Debtor's Monthly Operating Report for Period ending April 30, 2025); [ECF Doc. 26] (Debtor's Amended Schedule E/F).

The Debtor does not have sufficient means to pay mounting administrative expenses, debt service, or adequate protection payments to Richards, or payments of interest to Richards contemplated by 11 U.S.C. § 326(d)(3)(B). [ECF Docs. 80, 81, 88, 109 & 131].

**VI.  The Debtor Does Not Have Equity in the Property, and the Rents are Richards' Cash Collateral.**

In total, the Property is encumbered by: (i) the Mortgage securing the Debtor's obligations to Richards; (ii) the mortgage securing the Debtor's obligations to Capital Advisors, LLC; and (iii) liens securing the Debtor's property tax obligations (collectively, the "Encumbrances"). [ECF Doc. 146, ¶ 5].

The value of the Property exceeds the Mortgage securing the Debtor's obligations to Richards but does not exceed the total amount of the Encumbrances. *See id.* ¶ 6. Accordingly, the Debtor does not have equity in the Property for the purposes of 11 U.S.C. § 362(d)(2)(A). Although the Debtor scheduled the value of the Property at $4.1 million, that value contention is premised upon the Property being fully leased, which it is not. *See* Hr'g Rec'g 10:54–11:21. Therefore, the Property is not presently worth $4.1 million. Further, even if it were, the Encumbrances exceed that amount, as stipulated by the parties, reflected in the Schedules, and supported by the evidence in the record.

Based on the Affidavit and Report of D. Wesley Moore, II, CRE MAI CCIM, entered into evidence by stipulation, the Property was worth $2,625,000.00 as of April 14, 2025. *See* Richards Exs. 16 & 17. Further, the Debtor's post-petition rents are encumbered by Richards' Assignment of Rents pursuant to 11 U.S.C. § 552(b)(2).

7

VII. **This Case Involves Few Creditors, and Most Are Entities Related to the Debtor.**

No party-in-interest other than Richards and the United States Trustee has appeared in this case. Only five (5) creditors, including Richards, have filed proofs of claim. The Debtor's Amended Schedule E reflects seventeen (17) general unsecured creditors. [ECF Doc. 26]. Of these creditors, four (4) are scheduled as disputed, and none have filed proofs of claims.[4]

Twelve (12) of the scheduled general unsecured creditors are entities related to the Debtor, have the same office address as the Debtor, and have the same bookkeeper as the Debtor. *See* Hr'g Rec'g 10:54–11:21. The Debtor's recently filed Amended Disclosure Statement reflects that several of these related party claims are subject to offset, which Maumus confirmed during his testimony. [ECF Doc. 139]. But the Debtor's Amended Schedule E indicates that none of these claims are subject to offset. The Debtor has not provided the basis for the claim for any of the related party claims it scheduled.

The Debtor's Schedules and Statement of Financial Affairs also indicate that a number of insiders and related parties received prepetition transfers which may be avoidable under the Bankruptcy Code.

VIII. **The Debtor Filed a Plan and an Amended Plan, Neither of Which Demonstrate a Reasonable Possibility of Reorganization.**

On March 18, 2025, the Debtor filed its original disclosure statement and plan. [ECF Docs. 82 & 83].[5] On June 13, 2025, the Debtor filed its Amended Disclosure Statement and Amended Plan, which is the plan the Debtor seeks to confirm. *See* [ECF Docs. 139 & 140]; *see also* Hr'g Rec'g 10:54–11:21.

---

[4] *See* Claim No. 2 filed by IPFS.

[5] On June 18, 2025, the Court entered an Order granting the Debtor's Motion to deem its original plan timely filed for the purposes of 11 U.S.C. § 362(d)(3)(A). [ECF Doc. 151].

The Amended Plan is premised upon the Debtor's ability to continue to operate the Property and use Richards' cash collateral to make payments to creditors under the Amended Plan. *See* Debtor Exs. 9 & 10; Hr'g Rec'g 10:54–11:21. Maumus testified that the Amended Plan would be funded solely by Richards' cash collateral and that no equity contributions or other sources of income or financing would be available to fund the Amended Plan. *See* Hr'g Rec'g 10:54–11:21.

The Debtor's hope is that, after a period of five (5) years, the Debtor will be in position to refinance and/or pay off its debt to Richards and Capital Advisors with "balloon payments." *See* Debtor Exs. 9 & 10; Hr'g Rec'g 10:54–11:21. The Amended Plan proposes to pay Richards quarterly payments of interest only at a rate of 8.5% per annum for the first year. Over the ensuing four-year (4-yr.) period, the Amended Plan proposes to make monthly payments of principal and interest at 8.5% per annum, based on a thirty-year (30-yr.) amortization schedule. On the sixty-first (61st) month following the Distribution Date, the Amended Plan contemplates a balloon payment for the balance of Richards' claim. The Amended Plan also contemplates a similar balloon payment to satisfy the balance of the secured portion of Capital Advisors' claim.

In essence and operation, the Amended Plan would require Richards to forego its right to foreclose at this time in the hopes that the Amended Plan will succeed. Maumus testified that a sale of the Property now would satisfy Richards' claim, as would a payoff by an equity holder. But Maumus also testified that he did not know the amount of the refinancing necessary to satisfy the Richards Claim and Capital Advisors claim after five (5) years.

The precise mechanism for the balloon payoffs is unspecified. Rather, the Debtor's Amended Disclosure Statement provides that "[t]he balloon payment will be funded through Richards Collateral being refinanced with a third-party lender, payoff by an equity holder, or a sale

9

of the Collateral." Debtor Ex. 9.[6] The Debtor did not introduce evidence demonstrating its ability to make the balloon payments required under the Amended Plan, and the Debtor was unsure which of the mechanisms contemplated in the Amended Plan would be used to make the payment. *See* Hr'g Rec'g 10:54–11:21. The Amended Plan does not contain any commitment by equity to make contributions towards plan payments, refinancing, or payoff. *See id.*; Debtor Ex. 7 (as amended).

The Debtor's financial projections submitted in support of the feasibility of the Amended Plan do include certain transaction fees that the Debtor estimates it would incur in connection with a refinancing; however, those fees are based on a refinancing transaction of less than $2 million, which would be insufficient to make the balloon payments required under the Amended Plan. *See* Hr'g Rec'g 10:54–11:21. No known or likely refinancer or purchaser of the Property is identified in the Amended Plan.

The Amended Plan provides more favorable treatment to Capital Advisors than to Richards. Capital Advisors is scheduled as a creditor junior to Richards, but would receive a higher interest rate (9.25%) and shorter amortization period (15 years) under the Amended Plan. *See id.* Although the Debtor proposes to allow the claim of Capital Advisors in the scheduled amount of $2,450,130 and bifurcate the claim as partially secured and partially unsecured, the Debtor has not reviewed the Capital Advisors loan documents, has not independently verified or introduced evidence of funding of the Capital Advisors line of credit loan, and has not independently verified or introduced evidence of the use of any Capital Advisors loan proceeds that may have been received by the Debtor. *See id.*

---

[6] Although the Amended Plan also requires a similar balloon payment to Capital Advisors, there is no information provided in the Amended Plan or Disclosure Statement as to how this additional balloon payment will be funded. *Compare* §§ 4.2.1 and 4.3.1 of Amended Plan.

The Amended Plan is also premised upon the Debtor's successful lease-up to 92% economic occupancy by September 2025 and 100% economic occupancy by October 2025. Debtor Ex. 7 (as amended). The Court finds that those lease-up projections are overly optimistic and would require successful leasing which far outpaces the Debtor's lease-up efforts to date. *See* Hr'g Rec'g 10:54–11:21.

Further, any new leases would likely require rent concessions in the form of months of free rent because the Debtor lacks capital and therefore must require tenants to perform their own buildouts. *See id.* Accordingly, even if the Debtor were successful in procuring the additional tenants needed to reach its aggressive projected occupancy milestones, the Debtor would not receive the income stated in its financial projections. *See id.*

The Debtor's financial projections also contemplate a beginning cash balance of $45,466 in September of 2025. *See* Debtor Ex. 7 (as amended). But that amount is roughly the same amount the Debtor is holding in tenant deposits, meaning the Debtor essentially has zero available cash available in September 2025 according to its financial projections. *See* Hr'g Rec'g 10:54–11:21. Accordingly, the Debtor proposes to use tenant deposits to assist in the funding of plan payments and "true up" tenant deposit balances in August of 2026 by funding $16,050 towards the tenant deposits which the Debtor spent prepetition. *See* Debtor Ex. 7 (as amended). The Amended Plan does not propose to similarly "true up" post-petition tenant deposits of approximately $30,600.

The Debtor's Amended Plan financial projections also contemplate the receipt of significant gaming revenue from video poker. But no evidence was offered to indicate that this potential revenue source is available or reasonably certain to materialize. A number of contingencies must occur before the Debtor can realize any gaming revenue, and none have

11

occurred. Those include: (i) its tenant, Jamaican Jerk, must reach an agreement with a video poker vendor; (ii) Jamaican Jerk must apply and be issued a video poker gaming license; and (iii) the Debtor must then enter into a written video poker revenue-sharing agreement with Jamaican Jerk. *See* Hr'g Rec'g 10:54–11:21. The Debtor's management does not have experience with obtaining video poker licensing, is unaware of the timeline for Jamaican Jerk's license approval once an application for license is submitted, is unaware of the timeline from license approval to installation of machines, and is unaware of the timeline from installations of machines to the realization of revenue (assuming the required contracts are ever executed). *See id.*

The Amended Plan provides that the holders of administrative claims, in an amount the Debtor estimates will be "at least $150,000.00" will be paid in cash on or near the Effective Date, unless the holders of such claims enter into written agreements with the Debtor for less favorable treatment. But the Debtor does not have the cash to pay those claims and has not entered into any agreements with the holders of administrative claims for less favorable treatment. Further, per its financial projections, the Debtor proposes to use Richards' cash collateral to pay administrative claims and must delay payments of principal to Richards to fund administrative claims. *See id.*

Under the Debtor's Amended Plan, Debtor-related parties would be paid in full in amounts listed on the Debtor's schedules, despite the Debtor's Amended Disclosure Statement and Maumus's testimony that several of those claims are subject to setoff and despite the fact that several claimants have received potentially avoidable transfers.

The Amended Plan also contemplates that equity will retain their interests in the Debtor, may receive distributions under the Amended Plan before creditors are paid, and that "[p]ayments by Holders of Existing Equity Interests to fund administrative claims will be deemed new value contributions by Equity." Debtor Ex. 9, § 4.5. But the financial projections submitted in

12

connection with the Amended Plan do not contemplate any specific infusion of capital by equity. *See* Hr'g Rec'g 10:54–11:21.

## CONCLUSIONS OF LAW

"[T]he vast majority of chapter 11 cases do not end with confirmed plans of reorganization." *In re Canal Place Ltd. P'ship*, 921 F.2d 569, 577 (5th Cir. 1991) (citing *In re Timbers of Inwood Forest Assocs., Ltd*, 808 F.2d 363, 370 (5th Cir. 1987)). Therefore, Fifth Circuit jurisprudence tasks bankruptcy courts with the responsibility to "recognize these cases as promptly as possible and limit the administrative expenses and costs borne by the creditors." *Id.* "[A] debtor's inability to accomplish substantive progress toward confirmation inherently carries the risk of unreasonable and undue delay, which is nearly always prejudicial toward creditors...." *Samuels v. Wilmington Sav. Fund Soc'y*, No. 19-003, 2019 WL 6211209, at *6 (B.A.P. 1st Cir. Nov. 19, 2019). In single asset real estate cases, the importance of progress towards confirmation is heightened under the Bankruptcy Code, which provides secured creditors specified remedies, including relief from the automatic stay, if deadlines are not met.

Richards' Motion seeks conversion or dismissal under 11 U.S.C. § 1112(b) and relief from the automatic stay on several grounds enumerated in 11 U.S.C. § 362(d). The record before the Court demonstrates that Richards is entitled to the relief it seeks under the applicable provisions of the Bankruptcy Code.

### I. Richards Has Standing to Seek Conversion or Dismissal Under 11 U.S.C. § 1112(b)(1) and Stay Relief Under 11 U.S.C. § 362(d).

Section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part, that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11], whichever is in the best interests of creditors of the estate, for cause." 11 U.S.C. § 1112(b)(1). Richards is a party in interest and "may

raise and may appear and be heard on any issue in a case under this chapter . . ." 11 U.S.C. § 1109(b).

## II. Cause Exists To Dismiss the Case or Convert It to One Under Chapter 7.

Section 1112(b)(4) of the Bankruptcy Code lists sixteen non-exhaustive grounds that constitute "cause" for purposes of conversion or dismissal of a Chapter 11 case. 11 U.S.C. § 1112(b)(4). Among those codified circumstances constituting cause is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Section 1112(b)(4)(A) is written in the disjunctive, such that loss or diminution must be either substantial or continuing; it need not be both. The Congressional purpose of this codified instance of cause is to "prevent the debtor-in-possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *In re Sterling Bluff Investors, LLC*, 515 B.R. 902, 919 (Bankr. S.D. Ga. 2014). "Although section 1112(b)(4) does not list administrative insolvency as a cause to convert or dismiss a chapter 11 case, a court may still consider this factor." *In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) (citations omitted).

"In determining whether there is a continuing loss to or diminution of the estate, courts look beyond a debtor's financial statements and 'make a full evaluation of the present condition of the estate.'" *In re M & C Partnership*, 2021 WL 1679058, at *8 (citing *In re Briggs-Cockerham, L.L.C.*, 2010 WL 486674, at *5 (Bankr. N.D. Tex. 2010)). The estate has no unencumbered assets or income, yet accrues further debt with each passing day. The estate continues to accrue administrative expenses, which the Debtor estimates to be at least $150,000, yet has no means to pay them. The Debtor is accruing property taxes at the rate of approximately $3,000 per month which it is neither paying nor reserving cash to pay. The Debtor is also not making any payments

to Richards. In fact, the Debtor does not have sufficient cash flow required to make payments of even the interest accruing on the debt to Richards. As an oversecured creditor, Richards is entitled to post-petition interest and attorneys' fees under 11 U.S.C. § 506(b). *See U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) (holding that a creditor is unqualifiedly entitled to post-petition interest on its oversecured claim).[7]

Because the Court finds continuing loss to or substantial diminution of the estate, the Court must dismiss or convert the case, unless the Debtor has demonstrated a reasonable likelihood of rehabilitation. The Debtor has not done so. Despite a "breathing spell" of over six months in bankruptcy, the Debtor has not demonstrated that any successful reorganization exists on the horizon.[8] Even while the Debtor is not making any payments to its creditors, for taxes, or for its

---

[7] The Fifth Circuit recognizes that the default interest rate typically determines the extent of an oversecured lender's claim for post-petition interest under § 506(b). *In re Laymon*, 958 F.2d 72, 74 (5th Cir. 1992) (default rate provided by contract typically controls); *In re Southland Corp.*, 160 F.3d 1054, 1060 (5th Cir. 1998) ("What emerges from the post- *Ron Pair* decisions is a presumption in favor of the [default] contract rate, subject to rebuttal based on equitable considerations.") (citing *In re Terry Ltd. Partnership*, 27 F.3d 241, 243 (7th Cir. 1994)); *see also In re Age Refining, Inc.*, 801 F.3d 530, 535–36 n. 12 (5th Cir. 2015) (recognizing general rule allowing post-petition interest at default rate).

[8] A period of six months in chapter 11 is not an unusual or extraordinary length of time for a debtor to make progress toward rehabilitation. But this debtor is a single asset real estate debtor and with that designation comes expedited timeframes. Under 11 U.S.C. § 362(d), a creditor may move to lift the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest" and

> with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by and interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief . . . or 30 days after the court determines that the debtor is subject of this paragraph (whichever is later)—
>
> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments that—
>
> . . . .
>
> (ii) are in an amount equal to interest at the then applicable nondefault contact rate of interest for the value of the creditor's interest in the real estate . . . .

11 U.S.C. §§ 362(d)(1) & (3).

right-of-way lease, the Debtor is still barely breaking even according to its own representative's testimony. What little progress the Debtor has made towards leasing up its property is an insufficient basis to sustain this case, particularly given the single asset real estate nature of the Debtor.

"Whether cause exists under § 1112(b) and, if so, whether conversion or dismissal is appropriate are questions left to the sound discretion of the bankruptcy court." *In re M & C P'ship, LLC*, 2021 WL 1679058, at *8. In the instant matter, the timing of the Debtor's bankruptcy filing, the Debtor's motivation for the filing, the financial realities, the Debtor's lack of meaningful progress towards reorganization, the administrative drain on the estate, and the totality of circumstances all demonstrate that "cause" exists for conversion.

### III. Conversion of this Case to Chapter 7 Better Serves the Interests of Creditors and the Estate.

"Once cause is established under § 1112(b), a court must either dismiss the case or convert it to chapter 7." *In re Babayoff*, 445 B.R. 64, 81 (Bankr. E.D.N.Y. 2011). "There is no bright-line test to determine whether conversion or dismissal is in the best interest of creditors and the estate." *Id.* (internal punctuation and citations omitted). The decision between those two remedies is left to the "wide" discretion of the Court. *In re Koerner*, 800 F.2d 1358, 1367 (5th Cir. 1986) (citing S. REP. NO. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5903);

---

Here, the Debtor has not commenced monthly interest payments to Richards and the Court finds that the Debtor has failed to file a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time. The Amended Plan is not feasible as required for confirmation under 11 U.S.C. § 1129(a)(11) and Richards' treatment under the Amended Plan is not fair and equitable as required by 11 U.S.C. § 1129(b), as the evidence showed that the Debtor is not cash-flowing and its prospects of cash-flowing and refinancing are too speculative. *See In re M&C P'ship, LLC*, 2021 WL 12102059, at *7–10; *In re Bastankhah*, Nos. 10-40058 & 10-40060, 2012 WL 170901, at *3 (Bank. S.D. Tex. Jan. 18, 2012); *In re Geijsel*, 480 B.R. 238, 257 (Bankr. S.D. Tex. 2012). Thus, the Court finds that Richards met its burden under 11 U.S.C. 362(d) to obtain an Order of this Court terminating the automatic stay.

*see also In re Delta AG Grp.*, 596 B.R. 186, 200–01 (Bankr. W.D. La. 2019) (citing *In re Del Monico*, No. 04-B-28235, 2005 WL 1129774, at *3 (Bankr. N.D. Ill. May 13, 2005)).

The phrase "best interests of creditors and the estate" is not defined expressly in the Bankruptcy Code. And although courts generally accommodate the parties' choice when they all agree upon one course of action over the other, the test for what is in the "best interests of creditors and the estate" is not one of majority rule. *See Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994) (observing that the "best interest of creditors" test is "not served by merely tallying the votes of . . . creditors and yielding to the majority interest"). Therefore, "[w]hen parties disagree on conversion or dismissal, as they do here, the court evaluates the alternatives, and chooses the alternative that would be most advantageous to the estate as a whole." *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001). To do that, courts have considered multiple factors to determine whether conversion or dismissal better serves the interests of creditors and the estate, including:

1. Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.

2. Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.

3. Whether the debtor would simply file a further case upon dismissal.

4. The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors.

5. In assessing the interest of the estate, whether conversion or dismissal would maximize the estate's value as an economic enterprise.

6. Whether any remaining issues would be better resolved outside the bankruptcy forum.

7. Whether the estate consists of a "single asset."

8. Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

9. Whether a plan has been confirmed and whether any property remains in the estate to be administered.

10. Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*In re BH S & B Holdings, LLC*, 439 B.R. at 346–47 (citing 7 COLLIER ON BANKRUPTCY ¶ 1112.04[7] (Richard Levin & Henry J. Sommer eds., 16th ed.)); *see also In re Babayoff*, 445 B.R. at 81–82 (same). "Essentially, the above factors help the court compare how creditors fare inside, as opposed to outside, bankruptcy." *In re Green Box NA Green Bay, LLC*, 579 B.R. 504, 511 (Bankr. E.D. Wis. 2017) (citing *In re Helmers*, 361 B.R. 190, 197 (Bankr. D. Kan. 2007)). "So, a key question the court must ask is: what assets would be available for a chapter 7 trustee to liquidate and administer for the benefit of unsecured creditors if this case were converted?" *Id*.

But the text of § 1112(b) not only requires this Court to convert or dismiss the case based on the best interests of creditors—the Code also requires the Court to consider the best interests of the estate. *See* 11 U.S.C. § 1112(b)(1). This Court agrees with other courts and "is of the view that protecting the best interests of the estate includes protecting the bankruptcy process under which the estate is administered." *In re Capra*, 614 B.R. 291, 299 (Bankr. N.D. Ill. 2020). As the Supreme Court has observed, "bankruptcy causes fundamental changes in the nature of corporate relationships[;] [o]ne of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). When "a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession," that is, "th[e] obligation to treat all parties, not merely shareholders, fairly." *Id*. at 355–56. As part of that fiduciary obligation,

"the debtor is obligated to protect and conserve property in its possession, as well as to provide voluntary and honest disclosure of financial information—a reasonable '*quid pro quo*' for its temporary relief from substantial financial obligations." *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989). Indeed, "[t]he debtor-in-possession is viewed as a separate legal entity from the pre-petition debtor and is empowered to take all steps necessary to solve the problems created by the debtor's operation of the business in the past." *In re Chateaugay Corp.*, 102 B.R. 335, 354 (Bankr. S.D.N.Y. 1989) (internal quotations and citations omitted).

The Court finds that several of the enumerated factors that courts weigh in determining whether to dismiss or convert a case support conversion here, namely the likelihood that the debtor would simply file a further case upon dismissal, the likelihood that equality of distribution would be better served by conversion rather than dismissal (given, as an example, the conversion of tenant deposits), but most compelling, is the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors. Creditors here may benefit from the appointment of a chapter 7 trustee to serve as an independent fiduciary to quickly evaluate the estate, prosecute avoidance actions, and make a distribution. Conversion will promote final resolution of the disputes among the Debtor and its creditors.

For those reasons, the Court entered an Order granting in part and denying in part Richards' Motion and converting this case to one under chapter 7 of the Bankruptcy Code. [ECF Doc. 157].

New Orleans, Louisiana, July 9, 2025.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE